UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - X
                       :

UNITED STATES OF AMERICA     :

    - v. -                  :

DAVID WAGNER, and          :
MARC LAWRENCE,              :

            Defendants.   :
                       :

- - - - - - - - - - - - - - X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: JUN 1 2 2019

**SEALED INDICTMENT**

19 Cr.

**19 CRIM 437**

## COUNT ONE
### (Conspiracy to Commit Securities Fraud)

The Grand Jury charges:

### Overview of the Fraudulent Scheme

1.   From at least in or about December 2013 through at least in or about 2017, DAVID WAGNER and MARC LAWRENCE, the defendants, participated in the operation of a number of corporate entities collectively referred to herein as "Downing" as a Ponzi-like scheme.  Each of the Downing entities were majority-owned and controlled by WAGNER, and LAWRENCE served in senior executive positions in several Downing entities.  Downing was represented by WAGNER and LAWRENCE to be a venture capital firm that would invest in healthcare start-ups referred to as "portfolio companies" and provide sales, operations, and management expertise to the portfolio companies in order to bring their products to market and generate returns for Downing

JUDGE ABRAMS

investors, who also worked for Downing (the "employee-investors").

2.    DAVID WAGNER and MARC LAWRENCE, the defendants, and others acting at their direction, solicited more than approximately $8 million in investments in Downing from employee-investors located across the United States, including in the Southern District of New York, as a requirement of employment with Downing.  These investments were solicited through materially false and misleading statements regarding, among other things, Downing's use of investor proceeds, sources of funding, financial condition and ability to pay salaries to employee-investors, and portfolio companies.  Then, WAGNER and LAWRENCE misappropriated a significant portion of those funds from employee-investors and used them for, among other things, the payment of management fees and personal expenses, the repayment of prior investors, and operational expenses, rather than primarily for investments in portfolio companies as represented to many prospective employee-investors.

3.    After making the required investment of between $150,000 and $250,000 in Downing and starting their employment at Downing, employee-investors soon learned, among other things, that contrary to representations made by DAVID WAGNER and MARC LAWRENCE, the defendants, and others acting at their direction,

2

Downing did not have access to millions of dollars in funding, often could not make payroll, had virtually no products to sell, and that employee-investments were the overwhelming source of funding. Employee-investors also learned that WAGNER and LAWRENCE had misrepresented the companies in Downing's portfolio, their product readiness, and ability to generate revenue. While the particular formulation of these misrepresentations shifted over time, WAGNER and LAWRENCE systematically sought and obtained employee-investor money through materially false and misleading statements.

4.    Beginning in or about May 2016, after several employee-investors had brought lawsuits against DAVID WAGNER and MARC LAWRENCE, the defendants, and several Downing entities, alleging claims based on, among other things, fraud, WAGNER and LAWRENCE continued the scheme by recruiting employee-investors into a new company called Cliniflow Technologies, LLC ("Cliniflow") through materially false and misleading statements about Cliniflow's cash reserves, portfolio companies, and exposure to litigation. In fact, Cliniflow purportedly held majority ownership in the same primary portfolio company as other Downing entities and was simply a new name used by WAGNER and LAWRENCE to solicit investments from new employee-investors that was not tainted by the lawsuits filed against Downing

entities.  A majority of the over $1.5 million raised by WAGNER and LAWRENCE through Cliniflow was transferred to other Downing entities and used to pay for, among other things, WAGNER's personal expenses and the repayment of prior investors.

5.    Through this scheme, from at least in or about December 2013 through at least in or about 2017, DAVID WAGNER and MARC LAWRENCE, the defendants, defrauded more than approximately 30 Downing employee-investors out of more than approximately $8 million.

### Relevant Entities and Individuals

6.    At all times relevant to this Indictment, Downing Partners, LLC ("Downing Partners") was a Delaware limited liability company wholly owned and controlled by DAVID WAGNER, the defendant, who was the Chief Executive Officer and sole member of the Board of Managers of Downing Partners.  Downing Partners had offices primarily in Manhattan, New York, West Warwick, Rhode Island, and Boston, Massachusetts.  Downing Partners purported to provide strategic, management, advisory, and consulting services to certain other Downing entities described below.

7.    At all times relevant to this Indictment, Downing Investment Partners, LP ("DIP") was a Delaware limited partnership owned and controlled by DAVID WAGNER, the defendant,

4

through Downing Partners, which was the General Partner of DIP
and had complete control over the business and affairs of DIP.
At all relevant times, WAGNER and his family owned over 90% of
DIP, and WAGNER was the Chairman of DIP.  DIP maintained its
principal offices in Manhattan, New York and Boston,
Massachusetts.

8.    From at least in or about December 2013 through at
least in or about February 2015, DIP owned and controlled at
least two subsidiary holding companies that were formed to
acquire, hold, and manage portfolio companies:  Downing Digital
Healthcare Group, LLC ("DDHG") and Downing Medical Device Group,
LLC ("DMDG").  At all relevant times, DIP owned a majority of
DDHG and DMDG, and DAVID WAGNER, the defendant, was the Chairman
of the Board of Managers of DDHG and DMDG.  From at least in or
about June 2014 through in or about February 2015, MARC
LAWRENCE, the defendant, was either the Chief Development
officer of DDHG, or the President of DDHG.  DDHG and DMDG
maintained their principal offices in Boston, Massachusetts.

9.    In or about February 2015, DAVID WAGNER, the
defendant, merged DDHG and DMDG into a single entity, Downing
Health Technologies, LLC ("DHT"), which in turn had two
divisions: a "Digital" division and a "Medical Device" division.
At all relevant times, DIP owned a majority of DHT, and DAVID

5

WAGNER, the defendant, was the Chief Executive Officer and Chairman of the Board of Managers of DHT.  At all relevant times after at least in or about March 2015, MARC LAWRENCE, the defendant, was the President of DHT.  DHT maintained its principal offices in Manhattan, New York and Boston, Massachusetts.

10.  3si Systems, LLC was the successor to DDHG and DHT and held a portfolio company called Surgical Safety Solutions, LLC (together with 3si Systems, LLC, "3si").  3si purported to have a product that provided speech recognition technology in hospital operating rooms that monitored surgical workflows with real-time tracking and alerts for surgical procedures.  At all relevant times, DIP owned a majority of 3si, and DAVID WAGNER, the defendant, was the Executive Chairman of the Board of Managers of 3si.  3si maintained its principal offices in Manhattan, New York.

11.  In or about May 2016, after numerous employee-investors in the Downing antities filed lawsuits against, among others, DAVID WAGNER and MARC LAWRENCE, the defendants, and certain Downing entities, WAGNER formed Cliniflow (collectively with Downing Partners, DIP, DDHG, DMDG, DHT, and 3si, "Downing"), another company that was formed to acquire, hold, and manage portfolio companies.  At all relevant times, Hanover

6

Square Capital Partners, LP ("Hanover Square"), an entity wholly owned and controlled by WAGNER, owned a majority of Cliniflow, and WAGNER was the Executive Chairman of the Board of Managers of Cliniflow.  At all relevant times, MARC LAWRENCE, the defendant, was the President and Chief Executive Officer of Cliniflow.  Cliniflow maintained its principal offices in Manhattan, New York.

### Background on Downing

12.  As pitched to employee-investors and third-party recruiters hired by Downing to recruit employee-investors, Downing had a unique business model:  in exchange for a significant equity interest, Downing would provide portfolio companies with a combination of funding and middle office support, including marketing, sales, operations, and management expertise, to help portfolio companies bring their products to market and generate revenue.  DDHG, DMDG, DHT, 3si, and Cliniflow (collectively, the "Downing Funds") purportedly held the equity in the portfolio companies.  The Downing Funds, in turn, were majority-owned and funded by DIP, Downing Partners, or Hanover Square, all of which were controlled by DAVID WAGNER, the defendant.

13.  The Downing Funds were operating companies that employed business development, operations, marketing, and other

7

professionals, who would purportedly work directly with the portfolio companies.  As explained to prospective employee-investors, Downing Partners and DIP would provide the portfolio companies with capital while the Downing Funds would provide human capital to market, distribute, and sell the portfolio companies' products.  Although certain Downing Funds maintained offices in New York and Massachusetts, the Downing Funds' employees worked remotely from home.

14.  DAVID WAGNER and MARC LAWRENCE, the defendants, hired the majority of the Downing Funds' personnel and solicited their investments.  Each Downing employee-investor was provided with an offer letter that stated that the employee-investor would receive a salary, which typically ranged from approximately $150,000 to $250,000 per year depending on the seniority of the position.  As a condition of employment, all employee-investors were required to invest in the Downing entity that hired them, typically between $150,000 to $250,000, prior to starting their employment, which would entitle them to a *pro rata* share of any profits from the management or sale of the portfolio companies. In response to questions from employee-investors regarding why an investment was required, WAGNER and LAWRENCE explained, in substance and in part, that Downing required its employees to have "skin in the game" as motivation for performance.  In

actuality, despite representations to the contrary by WAGNER and LAWRENCE, employee-investments were the overwhelming source of funding for the Downing Funds.

15.  Employee-investors invested in the Downing Funds or DIP pursuant to private offering memoranda ("POMs").  DAVID WAGNER, the defendant, supervised the drafting, revision, and finalization of investor pitch materials and the POMs, which were often circulated to and discussed with prospective employee-investors by MARC LAWRENCE, the defendant.

16.  At all relevant times, DAVID WAGNER, the defendant, had signatory authority and exercised control over the bank accounts of Downing Partners, DIP, and the Downing Funds.

## THE FRAUDULENT SCHEME

### Materially False and Misleading Statements Used to Solicit Investments from DDHG Employee-Investors

17.  From at least in or about December 2013 through at least in or about February 2015, DAVID WAGNER and MARC LAWRENCE, the defendants, and others acting at their direction, solicited employee-investors in DDHG pursuant to a POM for a $4,500,000 private offering of DDHG units (the "DDHG POM").  Also during this period, WAGNER, LAWRENCE, and others acting at their direction, solicited employee-investors in 3si and DMDG.  The DDHG POM was drafted, in part, reviewed, and approved by WAGNER

9

and typically emailed to employee-investors by LAWRENCE.  The DDHG POM, which was revised over time, typically stated the following, in substance and in part, which was materially false and misleading, as further described below:

a.   The DDHG POM listed WAGNER as the Chairman of the Board of Managers of DDHG and indicated that he was "actively involved in the management" of DDHG.  It also provided that "[t]here is no accrued compensation that is due any member of Management," that "Management reserves the right to reasonably increase their salaries assuming the business is performing profitably and Company revenues are growing on schedule," and that "[c]urrently, there are no Management salaries paid by the Company to the Managers other than the [then-President of DDHG]."

b.   Under the heading "Use of Proceeds," the DDHG POM stated that DDHG intended to apply 80% of investor proceeds toward portfolio company investments, 8% toward marketing, 8% toward corporate expenses, 2% toward R&D of Properties, and 2% toward offering expenses.  There was typically no disclosure regarding any proceeds being used to pay management fees.

c.   Under the headings "Downing Proforma Portfolio," and "Downing Digital Healthcare Group Financial Model (%millions)," the DDHG POM often listed as many as nine

10

portfolio companies, including 3si, among Downing's holdings,
along with a description of their respective products, the
market, market entry date, a projected "year 3 revenue," and
Downing's ownership stake, which always exceeded 50%.
Typically, just three of the portfolio companies listed carried
an asterisk next to their name with the qualification "under
negotiation." In fact, as many employee-investors learned after
they began to work at Downing, the only portfolio company in
which Downing held a majority ownership stake at any time during
the fraudulent scheme was 3si. Prospective employee-investors
relied upon the foregoing materially false and misleading
statements in the DDHG POM and related materials in deciding to
make investments of between $150,000 and $250,000 in DDHG.

18. On or about March 3, 2014, approximately one month
before the first issuance of the DDHG POM, DAVID WAGNER, the
defendant, executed a management agreement between Downing
Partners and DDHG, which required DDHG to pay a monthly
management fee of $60,000 to Downing Partners (the "DDHG
Management Agreement"). WAGNER not only failed to disclose the
existence of the DDHG Management Agreement in most iterations of
the DDHG POM, but he also failed to revise the DDHG POM after
the management fees from DDHG to Downing Partners increased to
$80,000 per month on or about July 1, 2014. In a December 23,

11

2014 email to another Downing executive ("Downing Executive-1"),
WAGNER explained, "Downing Partners has annual expenses,
including salaries, that are supposed to be covered by the
management services contracts.  How else are you, me, [and other
Downing Partners employees] etc. supposed to get paid?"  WAGNER
also attached to that same email a profit and loss statement for
DDHG that reflected that, of the over approximately $1.5 million
raised from employee-investors pursuant to the DDHG POM,
approximately $540,000 or 35% was paid from DDHG to Downing
Partners for "management services fees," contrary to the DDHG
POM's statements regarding the lack of management fees and use
of proceeds.

19.  The DDHG employee-investors typically received an
offer letter from MARC LAWRENCE, the defendant, which provided
for a base compensation of at least $150,000 annually and
conditioned the offer of employment on making an investment of
approximately $250,000 in DDHG.  DAVID WAGNER, the defendant,
and LAWRENCE frequently made such representations, committing to
paying substantial salaries to employee-investors, despite the
fact that DDHG did not have sufficient funds at the time to make
payroll, often missed payroll, and did not disclose these facts
to potential employee-investors.  For example, after one
employee-investor ("Victim-1") wired a $250,000 investment to

DDHG on or about July 3, 2014 and subsequently began employment at DDHG, DDHG failed to pay Victim-1's first paycheck and consistently missed paychecks and expense reimbursements for Victim-1 thereafter.  DDHG also missed payments for several other employee-investors' first payrolls.

20.  DAVID WAGNER and MARC LAWRENCE, the defendants, were fully aware that Downing consistently did not have sufficient funds to meet payroll and employee expenses but nonetheless continued to solicit investments from DDHG employee-investors based on false representations that DDHG could pay a substantial salary.  WAGNER and LAWRENCE expressly discussed with one another and other Downing executives that investments from new DDHG employees would be used to meet payroll and expenses for existing employees, rather than to invest in portfolio companies as represented in the DDHG POM.  For example, on or about June 11, 2014, the then-President of DDHG ("DDHG President-1") exchanged a series of emails with WAGNER concerning the processing of the first payroll for DDHG.  WAGNER informed DDHG President-1, in substance and in part, that payroll could not be processed until DDHG President-1 had brought in investment funding from employee-investors, which were typically referred to as "closings."  DDHG President-1 replied, in substance and in part, that his fundraising goals of $1.5 million contemplated a

longer time horizon and that, in the meantime, payroll needed to
be met.  WAGNER replied, in substance and in part, that DDHG
President-1 had not yet raised any funds for the company and
that "[i]f I were in your position (which I have been many times
before) --- I would make sure that a closing occurs in the next
5-10 business days.  Do whatever you need to do."  In reply,
DDHG President-1 referred WAGNER to a financial model that the
Chief Financial Officer of Downing Partners had provided five
weeks earlier to DDHG President-1, which reflected that DDHG had
$300,000 in cash on hand.  WAGNER disclaimed that DDHG had
$300,000 in cash and went on to state the following:

> Look, you have been entrusted with the
> operational management of one of my companies.
> . . . I control [DDHG] as its Chairman and CEO
> and through controlling interest in the
> majority ownership and control of the
> company's board of directors — and I am
> setting your performance standard and
> assigning responsibility to you on an
> incremental basis based upon your success in
> meeting these performance standards.  Right
> now, the primary responsibility that you have
> been assigned is to bring in new capital at a
> rate of $250,000 per month starting May 2014.

21.  Further, on or about November 25, 2014, DAVID WAGNER
and MARC LAWRENCE, the defendants, exchanged emails regarding
how $400,000 in incoming investor funds from two investor-
employees would be used.  LAWRENCE requested that "this $400K be
used to bring the DDHG team current with payroll and expenses."

14

WAGNER confirmed that "[t]he incoming funds will be used to bring all of DDHG payment obligations current, most importantly the accrued payroll commitments and outstanding expenses."  When LAWRENCE suggested to WAGNER that he would be discussing the payroll issues on a group call, WAGNER stated the following: "You don't discuss matters like that in a group call, though do you?  Personally, I would never discuss matters like that in an open forum.  Particularly with new people on board.  Provides forum for negative discussions. . . . one-on-one personal offline discussions are the way to go there."  On or about December 1, 2014, immediately after $150,000 was received from one employee-investor, approximately $40,000 was transferred to a bank account for Downing Partners, approximately $26,000 was transferred to a bank account for DIP, approximately $16,667 was transferred to pay outstanding obligations to a former employee-investor, and more than approximately $50,000 was transferred to a payroll services company.

22.    While payroll was consistently being missed for Downing employee-investors, DAVID WAGNER, the defendant, transferred investment funds from new employee-investors to himself.  For example:

a.    On or about September 29, 2014, a DDHG employee-investor ("Victim-2") transferred an investment of approximately

15

$245,000 to DDHG's bank account.   That same day, approximately

$180,000 was transferred to a bank account for Downing Partners

and approximately $65,000 was transferred to a bank account for

DIP.  Also that same day, of the $180,000 transferred to the

bank account for Downing Partners, approximately $144,000 was

transferred to a bank account in the name of "Wagner Family Real

Estate Partners" (the "Wagner Real Estate Account") and another

approximately $10,000 was transferred to a bank account in the

name of WAGNER and his wife.

     b.    On or about October 2, 2014, the then-President of 3si

(the "3si President-1") sent an email to WAGNER regarding a

prospective $250,000 employee-investor for 3si ("Victim-3") and

stated, in substance and in part, that he was having "'sleepless

nights' worrying about how we will keep this going if we aren't

able to make payroll until the end of October or November."

WAGNER responded, in substance in part, by stating that 3si

President-1 should "'up the ante' with an enhanced offer" of a

higher salary because it was "critical to get that funding

inflow ASAP," and that getting the funds "would allow us to

bring all payrolls and expenses current – and maybe have a

little bit of extra cash for a change."  On or about October 6,

2014, after Victim-3 transferred an investment of $250,000 in

3si to 3si's bank account, approximately $90,000 was transferred

to Downing Partners on the same day and another approximately
$98,000 was transferred to a payroll services company. Of the
approximately $90,000 of Victim-3's investment that was
transferred to Downing Partners, at least approximately $25,000
was used to make a payment of approximately $97,000 for a 2015
Porsche Macan Turbo purchased by WAGNER in the name of Downing
Partners.

23.   Despite the representation in certain versions of the
DDHG POM that DDHG had an ownership stake in at least six
portfolio companies, DDHG in fact only had an interest in one
portfolio company, 3si, which had been founded by WAGNER
himself.   After Victim-1 had started working at DDHG and learned
that 3si was DDHG's only portfolio company, Victim-1 asked MARC
LAWRENCE, the defendant, about the status of the portfolio
companies other than 3si listed in the DDHG POM.   LAWRENCE
responded, in substance and in part, that those other portfolio
companies were, in fact, only candidates for DDHG's portfolio.
DDHG never acquired an equity interest in the other portfolio
companies listed in Victim-1's DDHG POM.

24.   MARC LAWRENCE, the defendant, also made materially
false and misleading statements regarding Downing's fundraising
and cash reserves when recruiting DDHG employee-investors.
LAWRENCE routinely assured DDHG employee-investors that DDHG was

17

well-funded and had access to millions in capital.   In fact,

Downing was routinely cash-strapped, DDHG frequently missed

payroll, and investment funding from new employee-investors was

typically used to pay the salaries, back pay, and overdue

expense reimbursements owed to other DDHG employee-investors.

### Materially False and Misleading Statements Used to Solicit Investments from DHT and DIP Employee-Investors

25.   Beginning in at least February 2015 through at least

in or about May 2016, DAVID WAGNER and MARC LAWRENCE, the

defendants, and others acting at their direction, solicited

employee-investors in DHT, the successor to DDHG, pursuant to a

POM for a $4,500,000 private offering of DHT units (the "DHT

POM").   Also during this period, WAGNER and LAWRENCE, and others

acting at their direction, solicited employee-investors in DIP.

Unlike the DDHG POM, the DHT POM, which was revised over time,

disclosed a management fee of $60,000 to Downing Partners and

stated that the use of proceeds "will be used to fund the

standard operations of the Company and to support new investment

requirements from the portfolio companies."

26.   The DHT POM typically stated that DHT had investments

in four portfolio companies, namely 60% of 3si, 30% of a second

portfolio company ("Portfolio Company-1"), 57% of a third

portfolio company ("Portfolio Company-2"), and an unspecified

percentage of a fourth portfolio company ("Portfolio Company-3"). In fact, at no time did Downing own more than 6% of Portfolio Company-1. Although Downing had contracts to purchase interests in Portfolio Company-1 and Portfolio Company-2, Downing failed to make payments to acquire those interests, which resulted in the cancellation of those agreements in or about July 2015.

27. Similarly to the materially false and misleading statements made to DDHG employee-investors, DAVID WAGNER and MARC LAWRENCE, the defendants, made materially false and misleading statements to employee-investors of DHT and DIP regarding Downing's financial condition. WAGNER and LAWRENCE represented to employee investors in various ways that Downing was well-funded and had access to capital, and DHT and DIP employee-investors relied upon these materially false and misleading statements in deciding to make investments of between $150,000 and $250,000 in DHT and DIP. At the time that WAGNER and LAWRENCE made many of these statements, Downing was, in fact, unable to make payroll for its existing employee-investors.

a.    For instance, in or about April 2015, WAGNER falsely assured a prospective DHT employee-investor ("Victim-4"), in substance and in part, that Downing Partners had access to

19

millions of dollars to support DHT. In or around the same time as this misrepresentation, WAGNER wrote Downing Executive-1 about the shortfall in capital inflows from employee-investors and stated the he and another Downing employee "have been working our asses off to work on miracle after another to keep the train from coming off the tracks the past few months." In addition, LAWRENCE falsely told Victim-4, in substance and in part, that DHT had access to millions and did not use investor proceeds to pay its operating expenses. In fact, Downing collectively had no more than hundreds of thousands of dollars in its bank accounts at the time of these misrepresentations. After Victim-4 invested $250,000 in DHT and began working at DHT, WAGNER and LAWRENCE pressured Victim-4 to recruit new employee-investors for DHT's sales team even though DHT had no products to sell and 3si, its only portfolio company at the time, did not have a market-ready product. After Victim-4 did not recruit any new employee-investors, WAGNER wrote the following to Downing Executive-1: "I am very tired of being saddled with people like [3si President-1 and Victim-4, among others] that just cannot get the job done with something as simple as getting one or two new hires per month closed." In or about August 2015, Victim-4's employment was terminated for his purported non-performance.

b.    In or about June 2015, WAGNER falsely represented to a prospective DIP employee-investor ("Victim-5"), in substance and in part, that DIP had approximately $1 million in cash on hand. In fact, DIP held less than $400,000 in its bank accounts at the time of this misrepresentation.  Shortly after Victim-5 invested $250,000 in DIP and began working at DIP, Victim-5 learned that Downing's employees and vendors were not getting paid and that 3si was the only company in DHT's portfolio.  The day after Victim-5's investment of $250,000 was transferred to DIP's bank account, approximately $83,340 was transferred to one bank account held by WAGNER and his wife, approximately $83,340 was transferred to a second bank account held by WAGNER and his wife, and approximately $83,307 was transferred to an account in the name of the "Wagner Family Irrevocable Education Trust."

c.    In or about August 2015, LAWRENCE falsely told a prospective DHT employee-investor ("Victim-6"), in substance and in part, that Downing had access to tens of millions of dollars. In fact, as WAGNER and LAWRENCE knew, Downing overwhelmingly received incoming cash flow from the investments of employee-investors, which were often transferred out of Downing bank accounts within a day or two of receipt of the funds.  After Victim-6 invested $50,000 in DHT, agreed to invest an additional $100,000 in DHT, and began work expecting to receive a salary of

$175,000 per year, DHT missed payroll during Victim-6's first week at work.

28.   As with the investments of employee-investors of DDHG and 3si, at a time when the Downing Funds were struggling to make payroll, DAVID WAGNER, the defendant, continued to transfer funds received from employee-investors to himself.   For example, on or about November 25, 2015, an employee-investor transferred an investment of $250,000 to DIP's bank account.   That same day, approximately $249,900 was transferred from DIP's bank account to the Wagner Real Estate Account, $170,000 of that amount was transferred from the Wagner Real Estate Account to a bank account for Downing Partners, and then $153,237 of that amount was used by WAGNER to purchase a 2016 Porsche Cayenne Turbo in the name of Downing Partners.

### Materially False and Misleading Statements Used to Solicit Investments from Cliniflow Employee-Investors

29.   By in or about May 2016, employee-investors in DIP and the Downing Funds brought multiple lawsuits against DAVID WAGNER and MARC LAWRENCE, the defendants, Downing Partners, DIP, and certain of the Downing Funds based on, among other things, claims of fraud.   As a result, WAGNER used Cliniflow as a new vehicle to recruit new employee-investors who were unaware of the problems at Downing.

30.   On or about July 1, 2016, MARC LAWRENCE, the defendant, sent an email to WAGNER, the defendant, explaining, in substance and in part, that LAWRENCE had "a 50% drop rate of qualified [employee-investor] candidates due to the info on the internet.  Regardless of using only 'Cliniflow' information, names can be searched to circle back to Downing.  As such, I am trying to source another recruiter to help mitigate the impact of the drop."  In the same email chain, WAGNER wrote to LAWRENCE that "[h]opefully now that we have made the transition to CFT [Cliniflow] we will have fewer bumps in the road."  WAGNER further emphasized to LAWRENCE, in substance and in part, that closings on funds from new Cliniflow employee-investors must remain on track and that "$2m in funding is required to be brought in over the next 2 months or so – and the 1st 50% or so of that funding goes to [DIP] and the 2nd 50% or so remains in CFT."  By using Cliniflow, WAGNER and LAWRENCE continued their pattern of soliciting investments from new employee-investors to pay off former employee-investors and as the primary source of funding for ongoing operations, which was contrary to representations made to prospective employee-investors.

31.   From at least in or about May 2016 through at least in or about January 2017, DAVID WAGNER and MARC LAWRENCE, the defendants, solicited employee-investors in Cliniflow pursuant

to a POM for a $20,000,000 private offering of Series C
Preferred Units (the "Cliniflow Series C POM"). The Cliniflow
Series C POM was drafted, in part, reviewed, and approved by
WAGNER and typically emailed to employee-investors by LAWRENCE.
The Cliniflow Series C POM, which was revised over time,
typically stated the following, in substance and in part, which
was materially false and misleading as further described below:

      a.   Under the heading "Use of Proceeds," the
Cliniflow Series C POM stated that investor proceeds will be
used to "fund the standard operations of the Company and to
support new investment requirements from the portfolio
companies." The Cliniflow Series C POM further specified that
the Company intended to apply investor proceeds substantially as
follows, "subject only to reallocation by Management in the best
interests of the Company": 80% toward subsidiary company
investments, 8% toward marketing & acquisitions, 8% toward
corporate expenses, 2% toward R&D, and 2% toward offering
expenses. There was no disclosure regarding any proceeds being
used to pay DIP. In fact, of the more than approximately $1.5
million in investor proceeds deposited in Cliniflow's bank
account, over which WAGNER had sole signatory authority, more
than approximately $900,000 was transferred to DIP and other
Downing entities, with significant sums ultimately wired to

24

WAGNER himself.  For example, on or about June 30, 2016, an employee-investor in Cliniflow ("Victim-7") transferred an investment of $90,000 to Cliniflow's bank account, which was transferred to DIP's bank account on the same day.  Of that $90,000 transferred to DIP's bank account, approximately $34,000 was transferred to an account for Downing Partners and then to the Wagner Real Estate Account, and another approximately $25,250 was transferred to Downing Acquisition Partners, LLC, which was used to pay approximately $7,300 to LAWRENCE and to pay approximately $6,300 to a prior DIP investor-employee.

b.  . The Cliniflow Business Plan attached to the Cliniflow Series C POM stated that "Cliniflow is a group of technology companies that are primarily focused on workflow optimization technologies with healthcare applications."  The Business Plan further indicated that Cliniflow had three portfolio companies, namely 3si and two other companies ("Portfolio Company-4" and "Portfolio Company-5").  In fact, at the time the Cliniflow Series C POM was sent to prospective employee-investors, Cliniflow did not hold an interest in Portfolio Company-4 but only had an agreement to purchase an interest that was never fulfilled.

c.  Under the heading "Litigation," the Cliniflow Series C POM stated that "[t]he Company is not presently a party

to any material litigation, nor to the knowledge of Management is any litigation threatened against the Company, which may materially affect the business of the Company or its assets." In fact, approximately one month prior to the first investment pursuant to the Cliniflow Series C POM, WAGNER, LAWRENCE, and 3si, a portfolio company of Cliniflow, among others, were sued in federal court by former employee-investors of Downing who were seeking damages of no less than $4 million and alleging that the defendants were perpetrating "an outright fraud and a novel Ponzi scheme" (the "Prior Downing Lawsuit"). LAWRENCE and WAGNER failed to disclose the Prior Downing Lawsuit to several prospective employee-investors in Cliniflow even though Cliniflow's primary portfolio company, 3si, was a party to the lawsuit.

32.   Similarly to the materially false and misleading statements made to DDHG, DHT, and DIP employee-investors, DAVID WAGNER and MARC LAWRENCE, the defendants, made materially false and misleading statements to prospective employee-investors of Cliniflow regarding its cash reserves, fundraising, ability to pay a substantial salary, and product readiness. The employee-investors relied upon these materially false and misleading statements in deciding to make investments of between $150,000 and $250,000 in Cliniflow. For example:

26

a.   In or about May or June 2016, LAWRENCE falsely told Victim-7, who was a prospective employee-investor at the time, in substance and in part, that Cliniflow had raised approximately $12 million of its $20 million Series C round of funding.  In fact, Victim-7 was the first Cliniflow employee-investor and prior to the transfer of Victim-7's investment to Cliniflow's bank account, the account had a balance of approximately $130.

b.   In or about July or August 2016, LAWRENCE falsely told a prospective Cliniflow employee-investor ("Victim-8"), in substance and in part, that Cliniflow had approximately $4 million in funding to invest into portfolio companies.

c.   In or about August 2016, after a prospective Cliniflow employee-investor ("Victim-9") learned of the Prior Downing Lawsuit, which had not been disclosed to Victim-9 by LAWRENCE, LAWRENCE left a voicemail message for Victim-9, which stated the following, in substance and in part:

> [T]he old regime, the Downing and all of that stuff, is not in Cliniflow.  And more importantly, the leadership at 3si has been replaced.  The leadership of [Portfolio Company-5] has been replaced.  We've got people in places in the companies that have a more of a moral compass.  I'll also tell you that the claims that you'll see on the internet — this one law firm in New York — they're just out of control. . . .  It's a shame but I'll even, candidly, I'll even put

27

you on the phone tomorrow with David Wagner, the Executive Chair, and let him talk to you if that would help. . . . I would pay close attention in your offertory letter where we tell you, you get your money back, which is the case for everybody else, so I don't know why it's a Ponzi if you get your money back. But you know there's explanations to everything and, you know, even though it's on the internet doesn't necessarily mean it's true.

These statements were false because the leadership of Downing and 3si, namely WAGNER and LAWRENCE, was the same leadership at Cliniflow. Further, based on the LAWRENCE's knowledge that Cliniflow was struggling to make payroll and that the only source of funds in Cliniflow were the investments from employee-investors, LAWRENCE knew that Victim-9's investment would be spent immediately and that Cliniflow would be unable to return Victim-9's investment. In reliance on LAWRENCE's false statements above as well as subsequent misrepresentations by LAWRENCE, in substance and in part, that Cliniflow had plenty of "dry powder" to pay its employees, Victim-9 made a $200,000 investment in Cliniflow and starting working for Cliniflow. On or about August 9, 2016, the same day that Victim-9's investment of $200,000 was transferred to Cliniflow's bank account, approximately $140,000 was transferred to DIP. Victim-9 was only paid a single paycheck while working at Cliniflow.

d.   In or about August and September 2016, WAGNER and LAWRENCE falsely represented to a prospective Cliniflow employee-investor ("Victim-10"), in substance and in part, that Cliniflow had millions of dollars in funding.  In fact, after Victim-10 had transferred a $250,000 investment to Cliniflow's bank account and began working at Cliniflow, Cliniflow missed Victim-10's first payroll and failed to pay Victim-10 a single paycheck.

e.   In or about October 2016, LAWRENCE falsely told a prospective Cliniflow employee-investor ("Victim-11"), in substance and in part, that Cliniflow was well-funded and its portfolio companies had products that were commercialized and ready to be sold.  In fact, after Victim-11 had transferred a $200,000 investment to Cliniflow's bank account and began working at Cliniflow in or about November 2016, Cliniflow missed Victim-11's first payroll and failed to pay Victim-11 a single paycheck.  Further, Cliniflow did not have products for Victim-11 to sell when Victim-11 started work at Cliniflow.

33.  A majority of the employee-investors in Downing never recovered the investments they made and are still owed backpay and reimbursements for expenses incurred while working at Downing.

**WAGNER'S False Statements to Obtain Funding for Cliniflow from the State of Connecticut and Misappropriation of Funds**

34.   In or about November 2016, DAVID WAGNER, the defendant, applied to the Connecticut Department of Economic and Community Development ("CTDECD") for a $300,000 loan and $100,000 grant pursuant to Connecticut's Small Business Express Program in order to support a relocation of Cliniflow from New York to Connecticut (the "CTDECD Application").

35.   In the CTDECD Application submitted by DAVID WAGNER, the defendant, WAGNER represented, in substance and in part, that Cliniflow had an address in Manhattan, New York and would use the $400,000 in funds for leasehold improvements, capital expenditures, and personnel costs in connection with a relocation to Connecticut.  The CTDECD Application also asked the following question:  "Does the applicant or its owners have any outstanding, pending or anticipated litigation, environmental, OSHA [Occupational Safety and Health Administration] or other issues outstanding?"  As noted above, despite the pending lawsuits against WAGNER, the majority owner of Cliniflow, and 3si, a portfolio company of Cliniflow, at the time WAGNER submitted the CTDECD Application, WAGNER falsely answered "No" to this question.

36.   On or about January 3, 2017, DAVID WAGNER, the
defendant, signed a certificate falsely certifying that he had
disclosed to the CTDECD "[a]ll private or governmental action
suits or proceedings against [Cliniflow] whether pending or
threatened and all judgments, decrees, or orders binding upon or
enjoining [Cliniflow]."   WAGNER did not, however, disclose the
Prior Downing Lawsuit to the CTDECD or arbitration claims filed
in or about late December 2016 against WAGNER, 3si, and
Cliniflow, among others, brought by former employee-investors of
Downing.

37.   On or about January 6, 2017, in reliance on the
representations made by DAVID WAGNER, the defendant, in the
CTDECD Application, the CTDECD agreed to extend a $300,000 loan
and $100,000 grant to Cliniflow pursuant to an Assistance
Agreement between the CTDECD and Cliniflow, which was signed by
WAGNER on behalf of Cliniflow (the "CTDECD Assistance
Agreement").   The CTDECD Assistance Agreement stated, in
substance and in part, that the funding "shall be used for
purposes set forth in the Commissioner's Letter of Intent,"
namely for capital and working capital expenditures in
connection with Cliniflow's relocation of its employees from New
York to Connecticut, and "for no other purposes."

38.   On or about January 13, 2017, the State of Connecticut transferred $400,000 to Cliniflow's bank account, which had a balance of $2.35 before the transfer.   A majority of those funds were misappropriated by DAVID WAGNER, the defendant, for personal expenses.   For example, on or about January 13, 2017, of the $400,000 deposited into Cliniflow's bank account, approximately $60,000 was transferred to DIP's bank account and approximately $65,000 was transferred to a bank account in the name of Hanover Square Management, LLC (the "Hanover Square Account"), which was under WAGNER's control.   Of the approximately $65,000 transferred to the Hanover Square Account, which had an overdraft of approximately $500 before the transfer, approximately $9,000 was transferred to the Wagner Real Estate Account, approximately $1,300 was transferred to accounts for WAGNER and his wife, and approximately $25,600 was used to buy a 2014 BMW Model 320 for WAGNER's daughter.   Between on or about January 17 and February 22, 2017, an additional approximately $130,000 of the funds received from the State of Connecticut were transferred to DIP's bank account or the Hanover Square Account.

## Statutory Allegations

39.   From at least in or about December 2013 through at least in or about 2017, in the Southern District of New York and

elsewhere, DAVID WAGNER and MARC LAWRENCE, the defendants, and others known and unknown, willfully and knowingly combined, conspired, confederated and agreed together and with each other to commit an offense against the United States, to wit, securities fraud, in violation of Title 15, United States Code, Sections 78j(b) & 78ff, and Title 17, Code of Federal Regulations, Section 240.10b-5.

40.   It was a part and object of the conspiracy that DAVID WAGNER and MARC LAWRENCE, the defendants, and others known and unknown, willfully and knowingly, directly and indirectly, by the use of the means and instrumentalities of interstate commerce, and of the mails, and of facilities of national securities exchanges, would and did use and employ, in connection with the purchase and sale of securities, manipulative and deceptive devices and contrivances, by: (a) employing devices, schemes and artifices to defraud; (b) making untrue statements of material fact and omitting to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and (c) engaging in acts, practices and courses of business which operated and would operate as a fraud and deceit upon persons, in violation of Title 15, United States

33

Code, Sections 78j(b) and 78ff, and Title 17, Code of Federal Regulations, Section 240.10b-5.

<u>Overt Acts</u>

41.  In furtherance of the conspiracy and to effect the illegal object thereof, DAVID WAGNER and MARC LAWRENCE, the defendants, committed the following overt acts, among others, in the Southern District of New York and elsewhere:

a.  In or about October 2014, WAGNER misappropriated investor funds received from Victim-3, who made a $250,000 investment in 3si, by using a portion of such funds to purchase a 2015 Porsche Macan Turbo.

b.  On or about November 25, 2014, WAGNER and LAWRENCE discussed using and did use investor proceeds from DDHG employee-investors to bring current the payroll and expenses of other DDHG employee-investors, which was contrary to statements in the DDHG POM regarding the use of proceeds.

c.  In or about April 2015, WAGNER and LAWRENCE falsely told Victim-4, a prospective DHT employee-investor, in substance and in part, that DHT had access to millions of dollars in funding, in order to solicit a $250,000 investment from Victim-4 in DHT.

d.  On or about June 23, 2016, WAGNER sent an email to LAWRENCE attaching an updated version of the Cliniflow Series

34

C POM, which contained materially false and misleading statements, and instructed LAWRENCE that "[t]his is what we should send out" to prospective employee-investors.

(Title 18, United States Code, Section 371.)

## COUNT TWO
### (Securities Fraud Relating to DDHG)

The Grand Jury further charges:

42.   The allegations set forth in paragraphs 1 through 38 are realleged and incorporated by reference as if fully set forth herein.

43.   From at least in or about December 2013 through at least in or about February 2015, in the Southern District of New York and elsewhere, DAVID WAGNER and MARC LAWRENCE, the defendants, willfully and knowingly, directly and indirectly, by the use of the means and instrumentalities of interstate commerce, and of the mails, and of facilities of national securities exchanges, in connection with the purchase and sale of securities, used and employed manipulative and deceptive devices and contrivances, in violation of Title 17, Code of Federal Regulations, Section 240.10b-5, by: (a) employing devices, schemes and artifices to defraud; (b) making untrue statements of material fact and omitting to state material facts necessary in order to make the statements made, in the light of

35

the circumstances under which they were made, not misleading;
and (c) engaging in acts, practices and courses of business
which operated and would operate as a fraud and deceit upon
persons, to wit, WAGNER and LAWRENCE solicited investments from
prospective employee-investors in DDHG through materially false
and misleading statements and omissions and misappropriated
funds that had been provided by DDHG employee-investors for
investments in portfolio companies.

(Title 15, United States Code, Sections 78j(b) & 78ff; Title 17,
Code of Federal Regulations, Section 240.10b-5; and Title 18,
United States Code, Section 2.)

## COUNT THREE
### (Securities Fraud Relating to DHT)

The Grand Jury further charges:

44.   The allegations set forth in paragraphs 1 through 38
are realleged and incorporated by reference as if fully set
forth herein.

45.   From at least February 2015 through at least in or
about May 2016, in the Southern District of New York and
elsewhere, DAVID WAGNER and MARC LAWRENCE, the defendants,
willfully and knowingly, directly and indirectly, by the use of
the means and instrumentalities of interstate commerce, and of
the mails, and of facilities of national securities exchanges,
in connection with the purchase and sale of securities, used and

36

employed manipulative and deceptive devices and contrivances, in violation of Title 17, Code of Federal Regulations, Section 240.10b-5, by: (a) employing devices, schemes and artifices to defraud; (b) making untrue statements of material fact and omitting to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and (c) engaging in acts, practices and courses of business which operated and would operate as a fraud and deceit upon persons, to wit, WAGNER and LAWRENCE solicited investments from prospective employee-investors in DHT through materially false and misleading statements and omissions and misappropriated funds that had been provided by DHT employee-investors for investments in portfolio companies.

(Title 15, United States Code, Sections 78j(b) & 78ff; Title 17, Code of Federal Regulations, Section 240.10b-5; and Title 18, United States Code, Section 2.)

## COUNT FOUR
### (Conspiracy to Commit Wire Fraud)

The Grand Jury further charges:

46.   The allegations set forth in paragraphs 1 through 38 are realleged and incorporated by reference as if fully set forth herein.

47.   From at least in or about December 2013 through at least in or about 2017, in the Southern District of New York and elsewhere, DAVID WAGNER and MARC LAWRENCE, the defendants, and others known and unknown, willfully and knowingly, did combine, conspire, confederate, and agree together and with each other to commit wire fraud, in violation of Title 18, United States Code, Section 1343.

48.   It was a part and an object of the conspiracy that DAVID WAGNER and MARC LAWRENCE, the defendants, and others known and unknown, willfully and knowingly, having devised and intending to devise a scheme and artifice to defraud and for obtaining money and property by means of false and fraudulent pretenses, representations, and promises, would and did transmit and cause to be transmitted by means of wire, radio, and television communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds for the purpose of executing such scheme and artifice, to wit, WAGNER and LAWRENCE engaged in a scheme to solicit investments from prospective employee-investors in Downing and to obtain funds from the State of Connecticut through materially false and misleading statements and omissions transmitted via interstate wire communications, and such investments and funds were misappropriated by WAGNER and LAWRENCE for purposes not

38

disclosed to prospective employee-investors and the State of
Connecticut.

(Title 18, United States Code, Section 1349.)

## COUNT FIVE
## (Wire Fraud)

The Grand Jury further charges:

49. The allegations set forth in paragraphs 1 through 38
of this Indictment are realleged and incorporated by reference
as if fully set forth herein.

50. From at least in or about December 2013 through at
least in or about 2017, in the Southern District of New York and
elsewhere, DAVID WAGNER and MARC LAWRENCE, the defendants,
willfully and knowingly, having devised and intending to devise
a scheme and artifice to defraud, and for obtaining money and
property by means of false and fraudulent pretenses,
representations, and promises, transmitted and caused to be
transmitted by means of wire, radio, and television
communication in interstate and foreign commerce writings,
signs, signals, pictures and sounds for the purpose of executing
such scheme and artifice, to wit, WAGNER and LAWRENCE solicited
investments from prospective employee-investors in Downing
through materially false and misleading statements and
omissions, misappropriated funds that had been wire transferred

by employee-investors for investments in portfolio companies, and used and caused the use of interstate wire communications in furtherance of those acts.

(Title 18, United States Code, Sections 1343 and 2.)

### FORFEITURE ALLEGATION

51.   As a result of committing one or more of the offenses alleged in Counts One through Five of this Indictment, DAVID WAGNER and MARC LAWRENCE, the defendants, shall forfeit to the United States, pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28 United States Code, Section 2461(c), any and all property, real or personal, which constitutes or is derived from proceeds traceable to the commission of said offenses, including but not limited to a sum of money in United States currency representing the amount of proceeds traceable to the commission of said offenses that the defendants personally obtained.

### Substitute Asset Provision

52.   If any of the above described forfeitable property, as a result of any act or omission of the defendants:

a.   cannot be located upon the exercise of due diligence;

b.   has been transferred or sold to, or deposited with, a third person;

c.   has been placed beyond the jurisdiction of the Court;

d.    has been substantially diminished in value; or

e.    has been commingled with other property which cannot be subdivided without difficulty;

it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p) and Title 28, United States Code, Section 2461(c), to seek forfeiture of any other property of the defendants up to the value of the above forfeitable property.

(Title 18, United States Code, Section 981,
Title 21, United States Code, Section 853(p), and
Title 28, United States Code, Section 2461(c).)


_____
FOREPERSON


_____
GEOFFREY S. BERMAN
United States Attorney

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

- v. -

DAVID WAGNER, and
MARC LAWRENCE

Defendants.

## INDICTMENT

19 Cr. ____

(Title 15, United States Code, Sections
78j(b) and 78ff; Title 17, Code of
Federal Regulations, Section 240.10b-5;
and Title 18, United States Code,
Sections 371, 1343, 1349 & 2)

GEOFFREY S. BERMAN
United States Attorney.

A TRUE BILL

Foreperson

*[signature]*

06/12/19    SEALED INDICTMENT FILED
(CA)        W/ ARREST WARRANTS

                    KN PARKER
                    USMJ