

**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

---

*The Silvio J. Mollo Building*
*One St. Andrews Plaza*
*New York, New York 10007*

June 3, 2021

**BY ECF**

The Honorable Alvin K. Hellerstein
United States District Judge
Southern District of New York
Thurgood Marshall United States Courthouse
40 Foley Square
New York, NY 10007

      Re:    <u>United States</u> v. <u>Marc Lawrence</u>, 19 Cr. 437 (AKH)

Dear Judge Hellerstein:

      The Government respectfully submits this letter in advance of the sentencing of defendant Marc Lawrence, which is scheduled for 2:30 p.m. on Wednesday, June 9, 2021, and in response to the defendant's sentencing submission filed on May 21, 2020 ("Def. Mem."). Application of the United States Sentencing Guidelines ("Guidelines") in this case results in a Guidelines sentencing range of 78 to 97 months' imprisonment. For the reasons set forth below, the Government respectfully submits that a Guidelines sentence would be sufficient but not greater than necessary to serve the legitimate purposes of sentencing and would be fair and appropriate in this case.

**I.**     **Offense Conduct**

    **A.**     **Overview**

      From in or about July 2014 through at least in or about 2017, Marc Lawrence served in various executive positions of a number of corporate entities (collectively referred to as "Downing" or the "Downing entities") through which he and his co-defendant David Wagner perpetrated a Ponzi-like investment scheme. Downing purported to invest in and develop start-up companies in the healthcare sector. (Presentence Investigation Report dated January 8, 2021 ("PSR") ¶¶ 15-16). According to its pitch materials, Downing focused exclusively on healthcare start-up companies with new products that were ready to go to market. In exchange for significant equity in the start-up companies (Downing's so-called "portfolio companies"), Downing promised to invest cash and to provide "middle office" sales, operations, and management expertise to market and sell the portfolio companies' products, thereby generating returns for Downing's investors. As a result, the Downing entities included both operating companies and investment companies, which were ostensibly intended to provide funding for the operating companies until

revenue could be generated. The operating companies employed up to approximately 35 professionals, chiefly in marketing, operations, business development, and sales at any given time. In a twist on the classic Ponzi scheme, Downing's investors were, overwhelmingly, its employees. (PSR ¶ 15). In fact, employment was *conditioned on* an investment in Downing. The scheme resulted in a total loss of almost $10 million to over 30 investors. (Presentence Investigation Report dated January 8, 2021 ("PSR") ¶¶ 14-15, 21).

Wagner used multiple executive recruiting firms to identify potential employee-investors and lure them to invest in Downing by promising a senior position as a marketing, sales, or operations executive, at a substantial salary. Recruiters directed most of the potential employee-investors to Lawrence, who recruited the majority of Downing's employee-investors turned victims. Lawrence, in turn, reported to Wagner. Lawrence interviewed potential job candidates and solicited their investments through meetings, phone calls, and emails. As a condition of employment, Wagner and Lawrence insisted that all employees invest between $150,000 and $250,000 in Downing itself, purportedly to ensure that employees were properly motivated and had "skin in the game." Relying on pitch decks and investment materials drafted and approved by Wagner, Lawrence knowingly made material misrepresentations and omissions to potential employee-investors about Downing's use of investor funds, sources of funding, financial condition, ability to pay salaries, and the companies (and products) in its investment portfolio.

To be sure, Lawrence was not, like Wagner, the architect of the scheme. The evidence does not suggest that Lawrence knew from the outset that the materials he provided to recruit employee-investors, or the financial data that he provided, were utterly unfounded. Nevertheless, soon after he started in Downing, Lawrence clearly realized that the repeated representations he made to Downing employee-investors were lies, and yet he continued to spout them to solicit new "employee-investors" on Wagner's behalf.

Once Wagner authorized Lawrence to hire a candidate, Lawrence provided the victim with an offer letter that set forth the employee-investor's salary, which typically ranged from $150,000 to $200,000 per year (as well as bonuses, and reimbursement of expenses) depending on the seniority of the position. (PSR ¶ 31). Wagner authorized these salaries and Lawrence extended them to prospective employee-investors even though both men knew that Downing routinely could not make payroll for its existing employees. (PSR ¶¶ 17, 41). In fact, several employee-investors wired their $250,000 investment, started working at Downing, and never received their first payroll. (PSR ¶¶ 40-41). As these victims came to learn, employee investments were being used, overwhelmingly, to pay the *outstanding* payroll owed to *other* employee-investors.

The offer letters also set forth the required level of investment in Downing as a condition employment. The vast majority of employee-investors were required to invest $250,000 and the offer letters provided that all investment funds had to be received *prior* to the employee-investor's start date. In addition to the offer letter, employee-investors executed their investments in Downing pursuant to private offering memoranda ("POMs"). The POMs were lengthy investment contracts, which set forth the pro rata share of any profits from the management or sale of the portfolio companies to which the investor was entitled as well as material information regarding the investment, such as capital structure, use of funds, management, and existing investments (portfolio companies). Although the precise terms of the POMs changed over time, the POMs—

which were drafted and approved by Wagner and largely circulated to and discussed with prospective employee-investors by Lawrence—consistently contained material omissions or misrepresentations about Downing's use of investor funds, investment portfolio, financing, and management fees.

A majority of the employee-investors in Downing never recovered the investments they made and continue to be owed backpay and reimbursements.

### B.  Misrepresentations about Downing Digital Healthcare Group ("DDHG")

Over the lifecycle of the scheme, Wagner frequently re-organized or re-named various Downing entities. In its initial iteration, which lasted from in or around December 2013 through February 2015, Wagner and Lawrence solicited employee-investors to invest in "Downing Digital Healthcare Group" or "DDHG," a Downing operating company of which Wagner was the Chairman and Lawrence was the Chief Development Officer and then President. (PSR ¶ 25). The DDHG POMs, which were typically emailed by Lawrence to prospective employee-investors, disclaimed any fees or salaries to management, specifically provided that 80% of investor funds would be directed toward investments in the portfolio companies, and stated that Downing held equity interests in at least six portfolio companies, with investments in three additional companies "under negotiation." (PSR ¶ 35). In fact, DDHG had invested in only *one* portfolio company—not six—and its product was nowhere close to being market-ready. (PSR ¶ 49).

Even after Lawrence realized that Downing consistently did not have sufficient funds to meet payroll and employee expenses, he continued to solicit investments from DDHG employee-investors based on false representations that DDHG could pay a substantial salary. (PSR ¶ 41). Lawrence's lies often went even further, as he routinely assured DDHG employee-investors that DDHG was well-funded and had access to millions in capital, when it was clearly cash-strapped and often missed payroll. (PSR ¶ 50). In fact, Lawrence and Wagner expressly discussed with one another and other Downing executives that investments from new DDHG employees would be used—were *intended* to be used—to meet payroll and expenses for existing employees, rather than to invest in portfolio companies as clearly represented in the DDHG POM. (PSR ¶¶ 41, 46). For example, on November 25, 2014, Lawrence requested that $400,000 in incoming investor funds "be used to bring the DDHG team current with payroll and expenses," which was contrary to the DDHG POM and representations Lawrence made to those investors. (*Id.*)

Because employee investments were the only reliable source of funding for Downing, Wagner and Lawrence continued to recruit employee-investors in Downing based on false representations that Downing could pay substantial salaries, had products in its portfolio to be brought to market, and substantial cash on hand.

### C.  Misrepresentations About Downing Healthcare Technologies ("DHT")

In February 2015, Wagner re-organized the Downing entities and directed Lawrence and others to solicit investment in Downing Healthcare Technologies ("DHT"). As with DDHG, Wagner was the Chairman and Lawrence was the President of DHT. (PSR ¶ 26).

Hon. Alvin K. Hellerstein
June 3, 2021
Page 4 of 12

Although the misrepresentations in the DHT POMs were not as egregious as those in the DDHG POM, Wagner and Lawrence nevertheless continued to solicit investments on the basis of material misrepresentations (oral and written) regarding Downing's financial solvency, sources of funding, and portfolio companies. For instance, the DHT POM indicated that DHT had majority investments in four portfolio companies. (PSR ¶ 53). In fact, DHT had a majority investment in just *one* portfolio company; with respect to the three others, DHT had purchase agreements in place, but never managed to fulfill its promised cash investments in these companies and so the agreements—and DHT's ability to sell their products—were ultimately terminated. (*Id.*).

In or around spring 2015, Downing's cash was running low, and yet Wagner and Lawrence nevertheless continued to assure prospective employee-investors that Downing had ready access to funding and disclaimed that employee investments were being used to fund the company. During this period, Lawrence continued to solicit new employee-investors even though DHT employees had no products to sell and Downing had repeatedly struggled to make payroll. For example, Lawrence told one victim that DHT had access to millions and did not use investor proceeds to pay its operating expenses, which was a blatant lie. (PSR ¶ 55). Then, after this victim invested $250,000 in DHT and began working at DHT, Lawrence and Wagner pressured this victim to recruit new employee-investors for DHT's sales team even though DHT had no products to sell. They then terminated this victim's employment for non-performance. (PSR ¶ 56). Lawrence similarly told another DHT victim that Downing had access to tens of millions of dollars; then, after this victim invested $50,000 in DHT and began to work at DHT expecting to receive a salary of approximately $175,000 per year, DHT missed this victim's first payroll, an anticipated consequence of the scheme. (PSR ¶ 58).

### D. Misrepresentations About CliniFlow

Throughout the operation of the scheme, Wagner and Lawrence tried to lull employee-investors into accepting the disruptions in payroll and the shifts in Downing's purported portfolio companies as routine obstacles encountered by any start-up. Wagner and Lawrence typically promised that new funding was just around the corner, or that Downing would finally have a product ready for sale. Eventually, Downing victims realized that these were lies. By May 2016, a critical mass of former employee-investors had brought multiple lawsuits against Downing, Wagner, Lawrence, and other senior executives, alleging that they were perpetrating "an outright fraud and a novel Ponzi scheme." (PSR ¶¶ 60, 64).

To avoid being associated with the ongoing litigation involving Downing and Downing's increasingly battered reputation online, Wagner decided to transfer all of Downing's assets to a new entity, "Cliniflow LLC." Indeed, as Wagner wrote to Lawrence, "[h]opefully now that we have made the transition to CFT [Cliniflow] we will have fewer bumps in the road." (PSR ¶ 62). The business model, however, was the same scheme, just repackaged. Under the banner of Cliniflow, beginning in May 2016, Lawrence, acting at Wagner's direction, solicited approximately $1.45 million in investments into Cliniflow by recruiting seven new employee-investors. As before, the pair promised the same six-figure salaries conditioned on an up-front investment of $150,000 to $250,000. (PSR ¶ 65). And, as with Downing, Wagner and Lawrence serially misrepresented Cliniflow's cash reserves, use of investor funds, portfolio companies, and exposure to litigation.

Importantly, Lawrence fully recognized that he and Wagner were simply continuing the Downing scheme under a new name and deliberately took actions to continue recruiting employee-investors, including by trying to avoid any connection between Downing and Cliniflow. Specifically, on July 1, 2016, Lawrence sent an email to Wagner explaining that Lawrence had "a 50% drop rate of qualified [employee-investor] candidates due to the info on the internet. Regardless of using only 'Cliniflow' information, names can be searched to circle back to Downing. As such, I am trying to source another recruiter to help mitigate the impact of the drop." (PSR ¶ 61). Lawrence further blatantly lied to employee-investors about the connection between Downing and Cliniflow. For example, in August 2016, after a victim who was deciding whether to invest in Cliniflow learned of the litigation involving Downing, which had not been disclosed to the victim by Lawrence, Lawrence left a voicemail message for the victim, which stated the following.

> [T]he old regime, the Downing and all of that stuff, is not in Cliniflow. And more importantly, the leadership at 3si has been replaced. The leadership of [another purported portfolio company] has been replaced. We've got people in places in the companies that have a more of a moral compass. I'll also tell you that the claims that you'll see on the internet - this one law firm in New York – they're just out of control . . . It's a shame but I'll even, candidly, I'll even put you on the phone tomorrow with David Wagner, the Executive Chair, and let him talk to you if that would help. I would pay close attention in your offertory letter where we tell you, you get your money back, which is the case for everybody else, so I don't know why it's a Ponzi if you get your money back. But you know there's explanations to everything and, you know, even though it's on the internet doesn't necessarily mean it's true.

(PSR ¶ 68). This voicemail speaks volumes as to Lawrence's intent. As Lawrence knew full well, the leadership of Downing and 3si was the same leadership at Cliniflow—Wagner and Lawrence—and Cliniflow was also struggling to make payroll. The victim who received this voicemail subsequently decided to invest $200,000 in Cliniflow based on Lawrence's lies and ended up receiving only a single paycheck. (PSR ¶¶ 69-70).

From the outset, Wagner and Lawrence explicitly planned to divert Cliniflow investor funds to repay the creditors and litigants who had been defrauded through Downing. (PSR ¶ 62). This use of investor funds was not disclosed in the Cliniflow POM, which, instead, expressly disavowed any material litigation risk to Cliniflow, despite its primary portfolio company having been sued in federal court the month before for fraud. (PSR ¶ 64). Like the DHT POM, the Cliniflow POM also falsely indicated that Cliniflow had a particular portfolio company, when in fact Cliniflow only held an agreement to purchase an interest in that company which was never fulfilled. (*Id.*).

Lawrence's lies to Cliniflow employee-investors regarding Cliniflow's cash reserves, fundraising, ability to pay a substantial salary, and product readiness, were particularly brazen.

For instance, in May or June 2016, Lawrence falsely told one victim that Cliniflow had raised approximately $12 million of its outstanding $20 million Series C funding round. Prior to this victim's investment, Cliniflow's bank account had a balance of approximately $130. (PSR ¶ 66). Not long thereafter, in or around July or August 2016, Lawrence told another employee-investor that Cliniflow had approximately $4 million in funding to invest in portfolio companies, which was false. (PSR ¶ 67). These were not isolated occurrences. In August and September 2016, Wagner and Lawrence falsely represented to a prospective employee-investor that Cliniflow had millions of dollars in funding. After the victim accepted the job and wired his investment, Cliniflow failed to pay the victim a single paycheck or return his investment. (PSR ¶ 71). The same thing happened to another employee-investor the following month, who was told by Lawrence that Cliniflow was well-funded and Cliniflow's portfolio companies had products that were ready to be sold. It was only after that employee-investor transferred $200,000 to Cliniflow's bank accounts and began working at Cliniflow that the employee-investor learned that Cliniflow had no products that were market-ready and could not make payroll. (PSR ¶ 72).

In total, Wagner and Lawrence defrauded more than 30 employee-investors in connection with their Ponzi-like investment scheme and caused losses of approximately $9,150,000 in investor funds. Lawrence himself is responsible for directly recruiting a majority of the employee-investors and causing a loss of approximately $4,550,000 to 22 employee-investors. (PSR ¶¶ 81, 85). While engaged in the scheme, Lawrence received salary payments from Downing totaling approximately $474,000 from 2014 through 2016, which were largely derived from employee-investors' losses. (PSR ¶ 146). Most employee-investors, however, lost their entire investment and were paid little to no salary.

## II. Procedural History, Cooperation, Guilty Plea, and Guidelines Calculation

Lawrence was arrested on June 14, 2019, on one count of conspiracy to commit securities fraud; two counts of securities fraud; one count of conspiracy to commit wire fraud; and one count of wire fraud, in violation of Title 15, United States Code, Sections 78j(b) & 78ff; Title 17, Code of Federal Regulations, Section 240.10b-5; Title 18, United States Code, Section 1349; and Title 18, United States Code, Section 1343. On October 19, 2020, Lawrence pleaded guilty to Counts Two (securities fraud), Three (securities fraud), and Five (wire fraud). (PSR ¶ 8).

Lawrence pleaded guilty pursuant to a plea agreement in which the parties stipulated that his Guidelines offense level is 28, based on a base offense level of seven for the grouped counts; an 18-level increase because his offense involved loss exceeding $3,500,000 but not exceeding $9,500,000 million; a two-level increase because the offense involved ten or more victims; a four-level increase for acting as an investment adviser; and a three-level reduction for Wagner's acceptance of responsibility. The parties further stipulated that Lawrence's Criminal History Category is I, based on his lack of any criminal history points, and, accordingly, that the Guidelines range is 78 to 97 months' imprisonment. (PSR ¶ 9). Lawrence agreed to forfeit $150,000, representing the fraud proceeds he personally obtained, and he also agreed to pay restitution to victims he directly recruited totaling $4,550,000. (PSR ¶ 9(k)-(l)).

Hon. Alvin K. Hellerstein
June 3, 2021
Page 7 of 12

In the PSR, the Probation Department concurs with the parties' Guidelines (PSR ¶¶ 90-103), forfeiture (PSR ¶ 173), and restitution (PSR ¶¶ 171) calculations. The Probation Department recommends a variance of 48 months' imprisonment (PSR at 40).

### III. Attempted Cooperation

As described in the defendant's sentencing submission, prior to pleading guilty, Lawrence met with the Government for three, lengthy proffer sessions in an effort to cooperate against Wagner and other individuals involved in Downing. (*See* Def Mem. at 13-16.)[1] Moreover, Lawrence came forward almost immediately after his arrest. Lawrence's counsel also provided, on basis of Lawrence's information, two memoranda to the Government compiling evidence against two individuals involved in Downing who were ultimately not charged. Finally, Lawrence expressed to the Government that he was willing to testify at trial against Wagner.

The Government believes that the information Lawrence provided about other individuals during these proffer sessions was truthful and that Lawrence ultimately accepted responsibility for his own criminal conduct prior to pleading guilty. However, the information Lawrence provided was largely known to the Government from other sources and did not result in any additional charges. The Government therefore did not extend a cooperation agreement to Lawrence, but the Court can and should consider Mr. Lawrence's efforts to cooperate in determining an appropriate sentence.

### IV. Applicable Law

The Guidelines still provide important guidance following *United States v. Booker*, 543 U.S. 220 (2005), and *United States v. Crosby*, 397 F.3d 103 (2d Cir. 2005). The Guidelines provide the "starting point and the initial benchmark" in sentencing proceedings. *Gall v. United States*, 552 U.S. 38, 49 (2007). After that calculation, the Court must consider the factors outlined in 18 U.S.C. § 3553(a). *Id.* at 49-50 & n.6. Those factors are: (1) "the nature and circumstances of the offense and the history and characteristics of the defendant"; (2) the four legitimate purposes of sentencing, namely, the need (a) "to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense," (b) "to afford adequate deterrence to criminal conduct," (c) "to protect the public from further crimes of the defendant," and (d) "to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner"; (3) "the kinds of sentences available"; (4) the Guidelines range itself; (5) any relevant policy statement by the Sentencing Commission; (6) "the need to avoid unwarranted sentence disparities among defendants"; and (7) "the need to provide restitution to any victims." 18 U.S.C. § 3553(a)(1)-(7).

---

[1] As noted by Lawrence in his submission, Lawrence also did have an extensive post-arrest interview with law enforcement agents during which he provided information about Downing and the individuals involved. Lawrence did not, however, fully admit his own fraudulent conduct during that interview and therefore the Government could not determine at that time whether the information Lawrence provided immediately after his arrest was trustworthy.

**V.     Discussion**

A sentence of imprisonment within the Guidelines range of 78 to 97 months is warranted based on the sentencing factors the Court must consider, particularly the nature and circumstances of the offense, *see* 18 U.S.C. § 3553(a)(1), the need to reflect the seriousness of the offense, promote respect for the law, and provide just punishment, *see id.* § 3553(a)(2)(A), and the need to afford adequate deterrence, *see id.* § 3553(a)(2)(B).

**A.     The Nature and Circumstances of the Offense and the Need to Reflect the Seriousness of the Offense, Promote Respect for the Law, and Provide Just Punishment**

Over a period of approximately three years, Lawrence directly recruited 22 employee-investors to invest total of approximately $4.55 million in Downing (and Cliniflow) through repeated lies about numerous aspects of Downing's funding and operations, including its use of investor funds, financial condition, ability to pay salaries, and portfolio companies. This protracted criminal conduct is in no sense an "aberration" as characterized by the defendant (Def. Mem. at 1), nor was Lawrence "aggressively manipulated and fooled" by Wagner (*id.* at 14). To the contrary, while he did not have access to Downing's bank accounts or finances, Lawrence had 35+ years of business experience prior to Downing and was fully aware of the egregious lies he told prospective employee-investors to convince them to invest in Downing and later in Cliniflow. He also had to know that the scheme to recruit employee-investors by promising substantial salaries where there were no products to sell and no outside funding for operations would not result in a successful business. And although he was acting at Wagner's direction and largely did not profit from the scheme in the same way as Wagner, Lawrence successfully recruited more investors through the scheme than Wagner himself.

What makes this crime particularly outrageous, however, is that Wagner and Lawrence coupled their investment pitch with the promise of employment. This added incentive lulled investors into a false sense of security. As one victim aptly put it: "The investment of $150,000 came directly from my retirement account . . . I went ahead with an expectation that the return, which included two years of salary at $150,000 plus compensation for performance, was a good, long term decision." (*See* Victim Statement #4). Because Downing routinely missed payroll, failed to pay expenses, and had interruptions in employee benefits, the false sense of security offered by Lawrence from employment at Downing quickly evaporated. Once victims realized that Downing was cash-strapped and had no products to sell, they began to demand the truth behind their missed paychecks and were quickly terminated by Wagner. As a result, Wagner and Lawrence robbed victims not only of their $250,000 investments, but also of the one thing that could best help them and their families to recover: the income and stability of a paying job.

The victim impact statements bear out the double blow that the loss of investment funds (which typically consisted of retirement and life savings) and the loss of employment (and benefits) placed on the dozens of victims and their families. Of the many victim impact statements received, below are a few excerpts of statements from victims who were directly defrauded by Lawrence:

- "[M]ost of what was pitched by Mr. Wagner and Mr. Lawrence were lies. When their scheme unraveled, I was left unemployed and without a significant portion of our retirement savings. . . . The impact on our family has been severe. Coming at a time when we were in the midst of putting three children through college, I was forced to address the loss of most of our financial nest egg, and effectively two years of lost wages . . . . Faced with unexpected unemployment in a highly competitive job market, I had to address not only the gap in my resume but also the fact that my association with these men was searchable in the public domain. . . . This is something from which I will never recover. Finally, on a personal level, this has caused an immense amount of strain on my family, as well as my personal health." (*See* Victim Statement #1).

- "The actions of both Marc Lawrence and David Wagner have greatly affected me and my family. I am constantly reminded of the stress created by the fraud these two criminals inflicted on me . . . [M]y ability to pay for my children's education is now permanently compromised" as financial losses included not only the $250,000 initial investment, but also $54,000 in unpaid wages and expenses, as well as "[l]ost wages associated with foregoing an alternative job offer at [another company] (worth $400K/year)." (*See* Victim Statement #2).

- "I was recruited by Marc Lawrence, whom I knew from when we both worked [together]. . . . Marc's 'pitch' in joining Downing was that of the opportunity to join an organization with a solid business model [and] a history of success . . . Once I began working for the company, it was clear there [was] . . . no market plan to speak of. The investment of $150,000 came directly from my retirement account. . . . The loss of approximately another $40,000 in salary also put a serious strain on my family's finances, causing additional funds to be withdrawn from savings so we could continue to pay our personal bills. . . . The out-of-pocket expenses for which I was never reimbursed were insult to injury. These expenses included promised healthcare insurance, a very important issue for a family of five." (*See* Victim Statement #4).

- "I lost my entire $150,00 investment that my wife and I churned over and over about until we made the decision to give this effort our best shot. . . . I was lied to by Mr. Lawrence from the very beginning, then during the entire affair as it rolled out, and finally at the very end. . . . The impact to my wife and me has been significant. I was hoping to achieve a comfortable enough full retirement position at the age of 65-66, but that has not been put off until I am at least 70 years old, perhaps longer." (*See* Victim Statement #5).

- "After making my investment of $250,000 out of my family's college fund money market account for our two children, I quickly learned that the whole company was a lie, scam and 'modified Ponzi scheme.' . . . My wife and I have since worked to save our college fund money again and she had to return to work as a nurse." (*See* Victim Statement #6).

- "The impact it had on me was the direct loss of my investment of $200,000 and the loss of income during the time between October of 2016 and May 2017 when I was finally able to find a new role with another company. Due to the abrupt nature of the crime, I had to liquidate our only two investment properties and borrow money from relatives to provide income for my family so that we did not lose our home." (*See* Victim Statement #3 submitted on Jan. 8, 2020).

As many of the victim witness statements bear out, Lawrence was aware of the hardships that he imposed on the Downing victims, most of whom he spoke or corresponded with directly. But that did not stop him from continuing the fraud and recruiting almost two dozen victims. As two victims recruited by Lawrence explain:

- "Before being aggressively recruited by Marc Lawrence I was [gainfully] employed as a VP with a company that had relocated my family to Boulder, Colorado. . . . At the meeting, Marc was very convincing, even producing impressive financials of the company's portfolio. . . . I accepted the position . . . [and] it was not long before I realized that something was not right because my first paycheck did not include reimbursement for travel expenses and the my paycheck was incorrect (a lessor amount then my agreed salary). . . . I confronted Marc about the financial issues but was assured that all is well. . . . I lost the window of opportunity to return to my previous position while being misled about the financial health of the company." (*See* Victim Statement #1 submitted on Jan. 8, 2020).

- "Marc Lawrence was the primary contact in my husband's employment at Downing. [He] flew to our hometown for the sole purpose of securing our funding; looking both of us directly in the eye, doing what he could to (falsely) assure us that this company was in the financial state that he claimed it was. . . . Not soon after his employment began, there were interruptions in his pay. . . . After months of back and forth with Marc Lawrence (often daily emails and verbal communication)," a wage complaint was filed and shortly thereafter, "my husband's employment was terminated. . . . During that time, we lost our family's income, health benefits, life savings (which in turn had tax implications), children's college savings, which led to them having student loan debt that they otherwise would not have had. It has been a devastating ordeal, one in which the recovery process has been slow and painful – one that we will never be made whole." (*See* Victim Statement #2 submitted on Apr. 14, 2021).

To be sure, Lawrence is less culpable relative to Wagner, because he did not initiate the scheme from the onset, did not profit from the scheme in the same way, and acted largely at the direction of Wagner. At bottom, however, Lawrence committed this crime for the same reason Wagner did – greed – although he gained far less from it. As he admits in his sentencing submission, Lawrence was paid almost half a million dollars for his recruitment of employee-investors, did not want to lose his job at Downing, and was concerned about his finances. (*See* Def. Mem. at 8-10, 24.) While Lawrence was selfishly concerned about his own financial future in committing this crime, his salary and financial security came at the cost of victims and *their* families. And Lawrence knew that. Yet he failed to leave Downing even when lawsuits alleging

Hon. Alvin K. Hellerstein
June 3, 2021
Page 11 of 12

fraud against him, Wagner, and Downing began to mount.  Instead of stopping the scheme, Lawrence and Wagner doubled down, re-branding Downing as "Cliniflow" in an attempt to recruit new employee-investors and distance themselves from Downing's tarnished reputation.

Notably, as Downing's circumstances became more dire, Lawrence's lies became more flagrant.  As discussed above, Lawrence falsely represented to multiple investors that Cliniflow had millions of dollars in funding when at the same time it was not able to make payroll.  Indeed, eight of the 22 victims recruited by Lawrence were recruited during the Cliniflow phase of the scheme, during which there can be no doubt that Lawrence was fully aware of Cliniflow's poor financial condition, lack of products to sell, and how investor proceeds were being spent.  Lawrence's egregious conduct during the Cliniflow phase of the scheme significantly undermines his claim now that he never intended to harm anyone and only wanted the business venture to succeed.  (*See* Def Mem. at 24).

Lawrence's years of repeated lies to employee-investors warrant significant punishment.  For these reasons, the seriousness of the defendant's conduct, the need for just punishment, and the need to promote respect for the law, warrant a sentence within the Guidelines range.

### B.  The Need to Deter Criminal Conduct

The need to afford deterrence also weighs in favor of a significant term of imprisonment.  Lying to investors as Lawrence did to secure their cash is criminal, and, given the facts described above and his vast business experience, the defendant's refrain that he intended to "make it work" and believed that employee-investors "would ultimately be made whole" is disingenuous.  (*See* Def. Mem. at 2, 9.)  Lawrence lied over years to 22 employee-investors and the harm he caused was right before his eyes as anguished employees missed payroll, had no products to sell, and lost their investments and life savings.  Lawrence nevertheless continued to lie to new potential investors simply to keep the scheme going and to receive his own paychecks, while others were left with nothing.  In particular, Lawrence's solicitation of approximately $1.5 million from eight additional employee-investors through Cliniflow despite having a pending lawsuit for fraud in Downing is strongly indicative of the need for deterrence here.  The sentence imposed must demonstrate that the consequences of committing this type of fraud—even with the (irrational) hope that all, eventually, will benefit—are severe.

### C.  The History and Characteristics of the Defendant

For the reasons set forth above, the sentence of probation requested by the defendant is wholly unreasonable and the reasons proffered by the defendant for such a sentence are unpersuasive.

First, the Guidelines sentencing range here is largely based not on some arbitrary number as suggested by the defendant, but on the actual loss to employee-investors caused and intended by Lawrence.  (Def. Mem. at 22-23).  The defendant's citation to *United States v. Gupta*, 904 F. Supp. 2d 349 (S.D.N.Y. 2012), is inapposite.  In *Gupta,* Judge Rakoff commented in an insider trading case that the Guidelines range for the breach of trust by the defendant in providing inside information to a third party was unreasonably driven by the amount of gain by a third party, which

was outside the control of the defendant. *Id.* at 351-53. Here, however, the Guidelines range is driven by an actual loss amount that was directly intended and caused by Lawrence, even if he did not directly profit in that amount. The Guidelines range therefore appropriately accounts for the actual loss caused by Lawrence to employee-investors, which, as described above, resulted in significant hardship to nearly two dozen victims and their families.

Second, Lawrence is 67 years old, does not have any children, and is in the middle of his fourth divorce with respect to which he appears to have failed to make court-obligated support payments. (PSR ¶¶ 118, 122.) He is also currently in a relationship with a 54-year-old woman in Florida who is a licensed school psychologist and owns a private practice where the defendant works. (PSR ¶ 123.) While a sentence of imprisonment would certainly have a toll on Lawrence's family and relationship, unlike many other defendants who have been sentenced to lengthy time in prison, Lawrence does not appear to be the sole caregiver for any young children or elderly family members and thus such obligations do not provide a basis for a non-incarceratory sentence.

Third, as he highlights in his sentencing submission and as set forth in the PSR, Lawrence has a history of medical issues and regularly takes several medications. (*See* PSR ¶¶ 129-33). The defendant nevertheless does not appear to argue, nor can he, that an appropriate BOP facility could not adequately provide him with the medical treatment he requires.

## VI.   Conclusion

For the reasons set forth above, the Government respectfully submits that a sentence within the Guidelines range of 78 to 97 months' imprisonment is appropriate in this case and would be sufficient, but not greater than necessary, to serve the legitimate purposes of sentencing.

Respectfully submitted,

AUDREY STRAUSS
United States Attorney

By: _____
Jilan Kamal / Sagar Ravi
Assistant United States Attorneys
Southern District of New York
(212) 637-2192 / 2195

cc:   Defense counsel (by ECF)